FRED D. WOLFE *v.* COUNTY COURT OF JACKSON COUNTY
*et al.*

(No. 8666)

Submitted September 2, 1937. Decided November 2, 1937.

*Perry Emmet O'Brien, George Burton Crow* and *Carter W. Staats,* for relator.

*W. F. Boggess, Dale G. Casto* and *M. C. Archer,* for respondents.

Fox, JUDGE:

In this proceeding the relator seeks to compel publication of the delinquent list covering taxes assessed for the fiscal year 1936-37 in "The Mountaineer", a recognized Democratic weekly newspaper published by him at Ripley, the county seat of Jackson County. This publication is required by Section 22, Article 9, Chapter 11 of the Code, as amended by Chapter 53, Acts of the Legislature, Regular Session 1935, the pertinent part of which, as amended, reads:

> "A copy of each of such lists (referring to delinquent lists) shall be posted at the front door of the courthouse of the county, at least two weeks before the session of the county court at which they are presented for examination. A copy of each of such lists shall at the same time be printed once, in two newspapers of opposite politics, if such there be in the county, and the cost of printing shall be paid out of the county treasury * * *."

The relator must, of course, show clear legal right to relief under the statute quoted. *Smith* v. *County Court,* 78 W. Va. 168, 88 S. E. 662, 20 A. L. R. 1030; this can be done in this case only by establishing that the newspaper published by him is the sole Democratic newspaper published in Jackson County within the meaning of the law. The undisputed fact that his paper is Democratic classifies it as "of opposite politics" from the recognized Republican newspaper published in that county; but if there are two Democratic newspapers published in that county, either could qualify under that classification, and this court has no power to decide between them in a dispute of this character.

Preliminary to a discussion of the points at issue herein, we deem it appropriate to make certain observations

which may throw some light on our approach to the troublesome questions we are called upon to decide. The fact that this is a government through the agencies of political parties, recognized in many ways in our statute laws, will not be disputed. It is an historical fact that during the entire life of this state, two dominant political organizations have, at different periods, operated and controlled our government. The existence of a so-called partisan press has been recognized in the several statutes which have been enacted from time to time, having to do with the publication of various legal notices and other papers of a public nature, where it seemed important that all of the people of all parties should become acquainted with their contents. The well known inclination of individuals to patronize that part of the press which best expresses their political views has prompted the legislature, in most instances, to require that these publications be made in newspapers of opposite politics, and, generally speaking, it has been the custom of officials having the right to designate where these publications would be made to select newspapers of undisputed and unquestionable loyalty to the party of their choice. This course has been followed out of a desire to conform to the spirit of the law, in order to reach the greatest number of people possible, and to give recognition to those, who, in fair weather or foul, have faithfully adhered to the tenets of their political faith. In this custom, there is an element of sportsmanship which, fortunately, has been a part of our political life. Men respect the bold, courageous and constant foe, and where favors must go to the opposition, prefer to give them to an open enemy rather than to one whose political position is likely to depend upon the uncertain tides of political fortune.

Therefore, in our consideration of the question before us, we are warranted in assuming that the legislature intended, when it directed the publication of the delinquent list in two newspapers of opposite politics, to require such publication to be made in newspapers the politics of which was well known, recognized and undisputed, and, where possible, of established standing and

circulation in the territory where the publication is sought to be circulated. Any other assumption would convict the legislature of intent to violate the spirit of the policy which prompted the publication in question, both with respect to the number of people to be reached and the recognition of the established press in the dominant parties. Usage and custom, as applied to other laws of a similar nature, support this theory of legislative intent. It cannot be believed that the legislature intended that in any county of the state the well recognized press of the two political parties, built up through years of devoted loyalty to a chosen political faith, should be passed over without good reason therefor. In politics, as a general rule, men do not expect or receive place and power not earned through party service, and newspapers, when the thing they seek is based on party affiliation as in this case, should be subjected to the same test.

Three weekly newspapers are published in Jackson County. Prior to December 31, 1936, two of these newspapers, the Jackson Herald and the Ravenswood News, adhered to the principles of the Republican party and each had done so for a long period of time, establishing for themselves the unquestioned right to be classified as Republican newspapers. The Mountaineer, the other of said papers, has for a like period of time adhered to the principles of the Democratic party and its right to be classified as a Democratic newspaper is not in dispute. The position of the Jackson Herald remains the same as in 1936 and it need not be further considered, except that it is to be understood as the one newspaper clearly entitled to publish the delinquent list, calling upon the other papers in question to establish that they are opposite in politics to it. Prior to December, 1936, the Ravenswood News was owned by Ray E. Ritchie, a former member of the state senate of West Virginia, then—and now—a Republican, and one of the recognized leaders of his party in his section. The editor of the News, D. F. Freeman, was, and still is, a Republican. Ritchie had acquired the ownership of the News through purchase at a foreclosure sale, and it appears that he and one D. E. Cole had become responsible for some character of pecuniary

obligation growing out of the purchase or operation of the paper, in which the Jackson County Bank was interested. The exact nature of this obligation is not made clear by the record. Cole, a recognized Democrat of long standing, was, and still is, president of said bank, and has been connected therewith for more than thirty years, and is, we gather from the record, a public spirited citizen of his community, but one whose particular interest, according to his own statement, is the management of his bank.

The Mountaineer is a Democratic newspaper, known and recognized as such over a long period of years, ninety per cent of whose circulation is among Democrats. We take judicial notice of the fact that the County of Jackson is now, and has been for decades, overwhelmingly Republican, during which time the Mountaineer, against great odds, has fought the battles of its party against the opposition of the Jackson Herald and the Ravenswood News.

In December, 1936, shortly after the end of a great political battle in which, as usual, the Republican ticket triumphed in Jackson County, carrying with it the election of the local Republican ticket, including its candidate for sheriff, there was a strange and startling change in the office of the Ravenswood News. Mr. Ritchie, a Republican leader, presented to Mr. Cole a proposition, in effect, as follows: Ritchie would sell to Cole a half interest in the News; although the Republican editor was to be retained, the News would become a Democratic paper, and Cole should have control of its editorial policy. Obligations of the News, in which both Ritchie and Cole were interested, would be provided for, and under the new arrangement, it was hoped that the paper could be made to pay its way. It is denied by Cole that there was any discussion of public printing at the time this proposition was made, but that was a subject which did not need discussion. That the principal motive in the new set-up was to place the News in a position where it would qualify in the matter of securing official publications is fairly clear from the circumstances surrounding the deal, and

made abundantly clear by what happened a few months later. That the Ravenswood News, published in a Republican community and county, with all the prestige which years of party service had built up, should, without this motive, suddenly and without change as to controlling ownership or editorship, transfer its political allegiance to a party so weak in comparative strength as is the Democratic party in that county, too far taxes our credulity. There are times, and this is one of them, when circumstances speak louder than words. There can be no reasonable doubt but that the proposed shift was to be made with the thought in mind, although possibly not expressed, that the best plan by which the newspaper could be made to pay its way and help Ritchie and Cole provide for their obligations in connection therewith was to switch politics, and thereby be in a position to get the printing of such official publications as are required to be published in papers of opposite politics. In carrying out their proposition, they had the active support of the sheriff of the county, whose alleged feeling against the relator is explained as growing out of the contest which resulted in his nomination and election. In the issue of December 31, 1936, the News publicly announced its change of heart, and from that time on has posed as a Democratic newspaper. A few editorials on public questions, which from their tenor, lead one to believe were written by one not having his heart in his work, appeared from time to time; a few pictures of prominent Democrats appeared, and attempts were occasionally made to discuss public questions from a Democratic viewpoint; but if the paper, by editorial or otherwise, attempted to circulate Democratic propaganda, we have failed to observe the proof of such action. After securing the Democratic share of public printing, it re-asserted its change of heart and became the self-proclaimed organ of the Democratic party, by a display line carried at the head of its columns, although the head of the Democratic organization of the county does not recognize it as a Democratic newspaper, and there is no evidence other than that of the sheriff that any Democrat so recognized it. No opportunity to test the sincerity of its miraculous

conversion has been afforded. The party to which it now professes allegiance has had no battles to fight since the News rallied to its standard, and what may happen when a battle opens, and when the rallying cry of its old comrade in arms is heard, must be left to conjecture.

The integrity and party loyalty of D. E. Cole is not questioned, but it is clear that his part in the affair was prompted by two motives: (1) To get the paper on a self-supporting basis in order that the obligations in which he and Ritchie were interested could be provided for, and (2) he wanted his community to have a newspaper. His statement that he would not have entered into this arrangement had it not been agreed that the paper should be Democratic in its politics, is, in view of his standing as a party man, creditable to him; but it is not sufficient to obscure what we believe to be the fact that the Ravenswood News is not, in good faith, a Democratic newspaper such as to entitle it to be classed under the law as opposite in politics from a recognized Republican newspaper.

If these things be true, are we required in this matter, wherein a public interest is involved and which calls for good faith and fair dealing by the members of the press of the two dominant political parties, to hold ourselves to technical rules, the application of which might compel us to say that the Ravenswood News is a Democratic newspaper simply because it claims to be such, and, being so, is as much entitled to public printing as is the Mountaineer, therefore barring relator from the relief he seeks? We are convinced that in this case we are not bound by narrow and technical rules; that a matter of grave public policy is involved; that this is a case in which we are not only warranted in taking into consideration all the surrounding circumstances, but where it is our clear duty to do so, and that we should not permit the fulfillment of a plan not, in our opinion, grounded on good faith and which, if generally followed, is calculated to insidiously undermine the integrity and loyalty of the press of the state and destroy the confidence and cooperation which happily have always existed in matters other than political contests.

The conclusion of the whole matter is this: If the Ravenswood News is a Democratic newspaper, the relator's case must fail; if it is not a Democratic newspaper, then he has a clear right to the relief prayed for in his petition. For reasons which we have given above, we hold that the Ravenswood News was not, at the time the publication of the delinquent list in question should have been made, a Democratic newspaper, and therefore not entitled to be classified as a paper opposite in politics to the regular Republican newspaper published in Jackson County.

Respondents rely on State ex rel. *Phillips* v. *Conley*, 108 W. Va. 107, 150 S. E. 376, to support their contention that the writ should not issue. However, the facts in that case were different. In the *Conley* case, the paper was newly established and deliberately allied itself with the Democratic party, and while its ownership was Republican, its editor was a Democrat. A newly established newspaper may become the supporter of any political party, or take an independent stand, without its good faith being questioned, and ask for and receive such benefits and privileges to which its position may entitle it; but such a situation is different from that now before us, where a sudden and radical change in politics—a change, figuratively speaking, "as wide as the poles"— is made on the part of a newspaper long established as the organ of the party from which it departs, and where, for reasons we have given, the present ownership, management and editorial policy do not convince us of the sincerity of its presently announced political faith. Aside from the testimony of Cole, there is nothing shown on which the respondents can rely to bring it within the principles of the *Conley* case, and as we have stated, we do not consider Cole's statement as sufficient to overcome the underlying circumstances upon which we base our decision.

A peremptory writ will issue.

*Writ issued.*